IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STEVEN HOTZE, M.D., WENDELL CHAMPION, HON. STEVE TOTH, AND SHARON HEMPHILL, | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 4:20-cv-3709 |
| v. | ) ) | |
| CHRIS HOLLINS, in his official capacity as Harris County Clerk, | ) ) ) | |
| Defendant. | ) ) ) | |
| _____ | ) | |

## DEFENDANT'S OPPOSITION TO PRELIMINARY INJUNCTION

THE ALEXANDER FIRM, PLLC
Joseph R. Alexander, JR.
*Of Counsel*
Texas Bar No. 00995150
Federal ID No. 1368
Two Greenway Plaza, Suite 650
Houston, Texas 77046
Telephone:    (713) 344-2094
Facsimile:    (713)513-5543
joe@alexanderfirmpllc.com

MITHOFF LAW
Richard Warren Mithoff
*Attorney of Record*
Texas Bar No. 14228500
Federal ID No. 2102
rmithoff@mithofflaw.com
Janie L Jordan
Texas Bar No. 11012700
Federal ID No. 17407
jjordan@mithofflaw.com
Sherie Potts Beckman
Texas Bar No. 16182400
Federal ID No. 11098
sbeckman@mithofflaw.com
500 Dallas Street, Suite 3450
Houston, Texas 77002
Telephone:    (713) 654-1122
Facsimile:    (713) 739-8085

**ATTORNEYS FOR DEFENDANT**

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................... i

TABLE OF AUTHORITIES ................................................................................... ii

I.      INTRODUCTION ..........................................................................................1

II.     NATURE AND STAGE OF PROCEEDINGS ...............................................1

III.    STATEMENT OF THE ISSUES AND STANDARD OF REVIEW .............2

IV.     SUMMARY OF ARGUMENT .......................................................................2

V.      ARGUMENT ..................................................................................................3

        A.      For numerous reasons, the Court should not entertain the
                merits of Plaintiffs' application for injunctive relief. ..........................4

                1.      Plaintiffs lack standing. ...............................................................4

                2.      The court should not intervene in an ongoing election ..............6

        B.      Plaintiffs' unjustifiable delay threatens to disenfranchise
                more than 100,000 voters, which is a compelling reason to
                deny relief. ..........................................................................................9

        C.      Plaintiffs cannot show a reasonable likelihood of success. ................13

                1.      Drive-through polling places satisfy the Texas Election
                        Code. ..........................................................................................13

                2.      In any event, Plaintiffs cannot prevail on their claim to
                        reject votes cast at drive-through polling places. ......................20

                3.      Even if Plaintiffs' interpretation of Texas law were
                        correct, their claims do not raise any substantial federal
                        question or invade any protected constitutional right. ..............24

        D.      Granting a preliminary injunction in the midst of the election
                would disserve the public interest. .....................................................27

CONCLUSION ......................................................................................................30

CERTIFICATE OF SERVICE ..............................................................................32

# TABLE OF AUTHORITIES

**Case**                                                                 **Page(s)**

*Altgelt v. Callaghan*,
    144 S.W. 1166 (Tex. Civ. App.—San Antonio 1912,
    writ dism'd w.o.j.) .................................................................................................22

*Alvarez v. Espinoza*,
    844 S.W.2d 238 (Tex. App.—San Antonio 1992,
    writ dism'd w.o.j.) .................................................................................................22

*Andino v. Middleton*,
    592 U.S. ___, 2020 WL 5887393 (2020) ...........................................................23

*Andrade v. NAACP of Austin*,
    345 S.W.3d 1 (Tex. 2011) .....................................................................................21

*Arizona State Leg. v. Arizona Indep. Redistricting Comm'n*,
    576 U.S. 787 (2015) ................................................................................................5

*Armco, Inc. v. Armco Burglar Alarm Co.*,
    693 F.2d 1155 (5th Cir. 1982) ...............................................................................9

*Baker v. Carr*,
    369 U.S. 186 (1962) ................................................................................................4

*Branaum v. Patrick*,
    643 S.W.2d 745 (Tex. App.—San Antonio 1982, no writ) ...............................22

*Bush v. Gore*,
    531 U.S. 98 (2000) ...............................................................................24, 25, 26, 27

*Citizen Ctr. v. Gessler*,
    770 F.3d 900 (10th Cir. 2014) .........................................................................6, 26

*Corman v. Torres*,
    287 F. Supp. 3d 558 (M.D. Pa. 2018) ....................................................................5

*Covey v. Arkansas River Co.*,
    865 F.2d 660 (5th Cir. 1989) .................................................................................9

*Democratic Nat'l Comm. v. Wisconsin State Legislature*,
   No. 20A66, 2020 WL 6275871 (Oct. 26, 2020 ....................................................7

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)...........................................................................................9

*Fishman v. Schaffer*,
   429 U.S. 1325 (1976).........................................................................................9

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018).......................................................................................5

*Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*,
   527 U.S. 308 (1999)...........................................................................................9

*Honts v. Shaw*,
   975 S.W.2d 816 (Tex. App.—Austin 1998, no pet.).........................................22

*In re Hotze*,
   20-0819, 2020 WL 6193918 (Tex. Oct. 22, 2020) ...........................................20

*Husted v. Ohio State Conference of NAACP*,
   573 U.S. 988 (2014)...........................................................................................7

*Hyundai Motor Co. v. Vasquez*,
   189 S.W.3d 743 (Tex. 2006) ............................................................................21

*Kay v. Austin*,
   621 F.2d 809 (6th Cir. 1980) ..............................................................................9

*Lance v. Coffman*,
   549 U.S. 437 (2007)............................................................................................4

*Little v. Alto Indep. Sch. Dist.*,
   513 S.W.2d 886 (Tex. Civ. App.—Tyler 1974, no writ) ..................................22

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)............................................................................................3

*Moore v. Circosta*,
   No. 20A72, 2020 WL 6305036 (Oct. 28, 2020)..................................................8

*Myers v. State*,
    No. 05-92-00430-CR, 1992 WL 276459
    (Tex. App.—Dallas 1992, no pet.) ....................................................................15

*Nat'l Ass'n of Gov't Emp. v. City Pub. Serv. Bd.*,
    40 F.3d 698 (5th Cir. 1994) ..............................................................................9

*Nken v. Holder*,
    556 U.S. 418 (2009).........................................................................................28

*North Carolina v. League of Women Voters*,
    574 U.S. 927 (2014).........................................................................................7

*Obama for America v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ..........................................................................28

*Perry v. Judd*,
    471 Fed. Appx. 219 (4th Cir. 2012)..................................................................9

*In re Pichardo*,
    14-20-00697-CV, 2020 WL 6051700 (Tex. App.—Houston
    [14th Dist.] Oct. 14, 2020, mandamus denied)................................................20

*Protect Our Parks, Inc. v. Chicago Park Dist.*,
    971 F.3d 722 (7th Cir. 2020) (Barrett, J.).........................................................6

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) (per curiam)..................................................................6, 7, 8

*Raines v. Byrd*,
    521 U.S. 811 (1997).........................................................................................5

*Ramsey v. Wilhelm*,
    52 S.W.2d 757 (Tex. Civ. App.—Austin 1932, writ ref'd).........................21, 22

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
    140 S. Ct. 1205 (2020).................................................................................6, 7

*Reynolds v. Sims*,
    377 U.S. 533 (1964).........................................................................................28

*In re State*,
    602 S.W.3d 549 (Tex. 2020) .....................................................................16, 21

*Texas Alliance for Retired Americans v. Hughs*,
   976 F.3d 564 (5th Cir. 2020) ...............................................................6

*Texas Democratic Party v. Abbott*,
   961 F.3d 389 (5th Cir. 2020). ............................................................29

*Thomas v. Groebl*,
   212 S.W.2d 625 (Tex. 1948) ...............................................................21

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017)..........................................................................4

*USI Sw., Inc. v. Edgewood Partners Ins. Ctr.*,
   No. 4:19-CV-04768, 2020 WL 2220573
   (S.D. Tex. May 6, 2020) (Hanen, J.) ...........................................3, 28

*Wesberry v. Sanders*,
   376 U.S. 1 (1964)..........................................................................12, 20

*Westermann v. Nelson*,
   409 U.S. 1236 (1972).............................................................................9

*Williams v. Rhodes*,
   393 U.S. 23 (1968).................................................................................9

*Williams v. Salerno*,
   792 F.2d 323 (2d Cir. 1986) ...............................................................28

*Winter v. NRDC*,
   555 U.S. 7 (2008)...................................................................................3

*Wise v. Circosta*,
   No. 20-2104, 2020 WL 6156302 (4th Cir. Oct. 20, 2020) ........8, 27, 29

## CONSTITUTION

U.S. Const. art. I, § 4, cl. 1......................................................................24

**STATUTES**

Local Gov't Code

    § 214.231 ..........................................................................................................15

    § 233.0615 ........................................................................................................15

Tex. Elec. Code

    § 31.003 ...................................................................................................16, 25

    § 41.008 ............................................................................................................21

    § 43.031(b) .......................................................................................................15

    § 64.009 ..........................................................................................13, 17, 18

    § 64.009(a) .......................................................................................................18

    § 64.012 ............................................................................................................29

    § 82.002 ............................................................................................................18

    § 85.062(a)(1) ..................................................................................................13

    § 85.062(b) .......................................................................................................13

    § 104.001 ..........................................................................................................18

Tex. Penal Code § 30.01 ...................................................................................15

**OTHER AUTHORITIES**

Black's Law Dictionary 194-95 (6th ed. 1990) ................................................15

Black's Law Dictionary 1424 (6th ed. 1990) ..................................................14

TO THE HON. ANDREW HANEN, UNITED STATES DISTRICT JUDGE:

Defendant Chris Hollins, in his official capacity as Harris County Clerk, respectfully files this response to Plaintiffs' application for a preliminary injunction.[1]

## I.   INTRODUCTION

Early voting has now ended.  Election Day is November 3, 2020—tomorrow. There is no justification for Plaintiffs' eleventh-hour attempt to disrupt the election by seeking to enjoin a voting procedure that was announced publicly months ago, approved by the Texas Secretary of State Elections Division, used successfully in the primary elections without challenge, and relied on by more than 100,000 voters. Granting the relief sought by Plaintiffs would disenfranchise a breathtaking number of voters in a naked attempt to influence the outcome of a closely-contested election. Crucially, the Texas Supreme Court has denied relief based on these same arguments about the meaning of the Texas Election Code—twice.  *See* Ex. 1-2.  This Court should do the same and deny the application for a preliminary injunction.

## II.   NATURE AND STAGE OF PROCEEDINGS

On October 28, 2020—two days before the end of the early voting period for the November 2020 general election—Plaintiffs filed their complaint and requested a preliminary injunction.  (Doc. Nos. 1, 3-4).  The Court set a hearing. (Doc. No. 6).

---

[1] Because Defendant's answer is not yet due, Defendant reserves the right to file an answer and assert any Rule 12 defenses in due course.

### III.   STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

1.   Whether Plaintiffs have standing to assert their claims.

2.   Whether a district court should intervene in an ongoing election.

3.   Whether Plaintiffs' unjustifiable delay and the resulting prejudice bars injunctive relief.

4.   Whether Plaintiffs have satisfied their burden of showing a substantial likelihood of success on the merits of each of their claims for relief—which requires them to establish (a) the alleged violations of Texas law, and also (b) the alleged violations of either the Elections Clause or the Equal Protection Clause of the U.S. Constitution.

5.   Whether granting injunctive relief in the midst of an election would disserve the public interest.

### IV.   SUMMARY OF ARGUMENT

Plaintiffs' federal claims depend on the premise that drive-through voting violates the Texas Election Code.  Twice in the last two weeks, they have taken that argument to the final arbiter of Texas law—the Texas Supreme Court—and lost. Most recently, they presented identical arguments to the Texas Supreme Court in a petition for a writ of mandamus that alleged the same violations of the Election Code, Ex. 3 at 10-11, 15-19, asserted the same federal rights, *id.* at 12-14, 19-20, and sought precisely the same remedies.  *Id.* at 25-26.  The Texas Supreme Court denied relief. Ex. 1.  The Texas Supreme Court does not agree that drive-through voting violates the Texas Election Code in any way that warrants the invasive step of an injunction (even one that simply "secures" voting records), so this Court should not interfere.

2

## V.    ARGUMENT

It is well-settled that a preliminary injunction is "an 'extraordinary remedy' that should only be granted if the movant has 'clearly carried the burden of persuasion' on all four factors." *USI Sw., Inc. v. Edgewood Partners Ins. Ctr.*, No. 4:19-CV-04768, 2020 WL 2220573, at *3 (S.D. Tex. May 6, 2020) (Hanen, J.) (citation omitted).  Although a movant need not prove its case, it must "clearly show" each of the four factors for injunctive relief:

> (1) a substantial likelihood that the movant will prevail on the merits;
>
> (2) a substantial threat of irreparable injury if the injunction is not granted;
>
> (3) the injury outweighs the threatened harm to the party to be enjoined; and
>
> (4) granting a preliminary injunction will not disserve the public interest.

*Id.*; *see also Winter v. NRDC*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.") (citation omitted) (emphasis in original).  Plaintiffs cannot meet that test under the extraordinary circumstances of this case.

**A.     For numerous reasons, the Court should not entertain the merits of Plaintiffs' application for injunctive relief.**

Before turning to the merits of Plaintiffs' claims and the injunction factors, there are a series of jurisdictional and prudential barriers to be addressed.

### 1.     Plaintiffs lack standing.

Plaintiffs' complaint alleges violations of Article I, section IV, clause 1 of the U.S. Constitution (the "Elections Clause") and the Equal Protection Clause of the Fourteenth Amendment.  Complaint at 1-2, 9-11, 11-12.  Standing must exist for "each claim."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citing cases).  Plaintiffs cannot establish standing for either claim.

First, the Elections Clause claim alleges the violation of a right that belongs to the Legislature—not to any individual voter, legislator, or candidate.  Therefore, none of the Plaintiffs can establish an individual injury-in-fact that provides standing to litigate this particular claim.  *See Lance v. Coffman*, 549 U.S. 437, 442 (2007).  Indeed, the U.S. Supreme Court's reasoning in *Lance* is equally applicable here:

> The only injury plaintiffs allege is that the law—specifically the Elections Clause—has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing.  Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring their Elections Clause claim.

*Id.* (citing and distinguishing *Baker v. Carr*, 369 U.S. 186 (1962)).

4

This conclusion is not altered by the fact that one of the Plaintiffs here, Representative Toth, is a member of the Texas Legislature.  At least with respect to the Elections Clause claim, Representative Toth has suffered no individual injury, but alleges an "institutional injury" that is "wholly abstract and widely dispersed." *Raines v. Byrd*, 521 U.S. 811, 829 (1997).  This is not a case in which the entire Legislature is appearing as "an institutional plaintiff asserting an institutional injury" that has "commenced this action after authorizing votes in both of its chambers." *Arizona State Leg. v. Arizona Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015).  Accordingly, Representative Toth has no standing to assert the claim either. *Corman v. Torres*, 287 F. Supp. 3d 558, 567-69 (M.D. Pa. 2018) (three-judge court applying this principle to state legislators alleging Elections Clause violations).

As for Plaintiffs' equal protection claim, none of them has demonstrated any individual and particularized injury that differentiates them from all other voters. They complain that equal protection is violated because Harris County voters are being treated differently from voters in other counties.  *See* Complaint at 11-12, 16.[2] But Plaintiffs are not suffering any *individual* injury.  "[T]he fundamental problem" with their equal protection claim is that "[i]t is a case about group political interests, not individual legal rights." *Gill v. Whitford*, 138 S. Ct. 1916, 1922 (2018).

---

[2] Plaintiffs are mistaken to assert that Harris County is the only county using drive-through voting. http://users.neo.registeredsite.com/2/5/8/19955852/assets/EV_HOURS38404.pdf (Calhoun Cty.).

Moreover, the essential premise of the equal protection claim is incorrect. Because the Clerk treats every Harris County voter equally, the fact that this county offers different polling places than other counties does not mean the Clerk has denied residents of Harris County equal protection of the law. *See Citizen Ctr. v. Gessler*, 770 F.3d 900, 917–19 (10th Cir. 2014). Plaintiffs are entitled to disagree with the Clerk's use of drive-through polling places, but "recognizing standing based on such an 'undifferentiated' injury is fundamentally 'inconsistent' with the exercise of the judicial power." *Protect Our Parks, Inc. v. Chicago Park Dist.*, 971 F.3d 722, 731 (7th Cir. 2020) (Barrett, J.) (citation omitted).

### 2. The court should not intervene in an ongoing election.

This Court should not interfere in the middle of an ongoing election, especially when the procedure in question was implemented by a public official exercising his official duties and was previously approved by the Elections Division of the Texas Secretary of State. *See* Ex. 6 at ¶ 5.

Since *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) stated this principle, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *see also Texas Alliance for Retired Americans v. Hughs*, 976 F.3d 564 (5th Cir. 2020) (noting the "value of preserving the status quo in a voting case on the eve of an election").

The *Purcell* principle has been consistently followed by the Supreme Court. *Democratic Nat'l Comm. v. Wisconsin State Legislature*, No. 20A66, 2020 WL 6275871, at *3 (Oct. 26, 2020) (Kavanaugh, J., concurring) (collecting cases). Simply put, a district court should not "intervene[] in the thick of election season to enjoin enforcement of a State's laws." *Id.* at *1 (Roberts, C.J., concurring).

The *Purcell* principle has been applied to vacate lower courts' decisions enjoining state election rules when the election was close at hand. *See, e.g.*, *Purcell*, 549 U.S. at 3, 5-6 (vacating an injunction entered 33 days before election day); *Republican Nat'l Committee*, 140 S. Ct. at 1208-09 (staying an injunction entered five days before election day); *see also North Carolina v. League of Women Voters*, 574 U.S. 927 (2014) (staying an injunction entered 32 days before election day); *Husted v. Ohio State Conference of NAACP*, 573 U.S. 988 (2014) (staying an injunction entered 61 days before election day).

Here, Plaintiffs are seeking an injunction not "on the eve of an election," *Republican Nat'l Comm.*, 140 S. Ct. at 1207, but in the middle of it. Early voting occurred between October 13-30, 2020. Election Day is tomorrow, November 3. More than 1.4 million residents of Harris County have voted already, Ex. 12, 17, including 126,912 who voted at drive-through polling places. *Id.* Intervening now would foment controversy and "result in voter confusion," *Purcell*, 549 U.S. at 5-6, especially among voters left to wonder whether their votes will be counted.

If this Court issues a preliminary injunction, the risk of voter confusion and a "consequent incentive to remain away from the polls," *id*., will be intolerably high. First, individuals who have not voted yet and are relying on drive-through voting may become confused and stay away from the polls. Indeed, it is impossible to quantify how many individuals chose not to request mail ballots because they were relying on drive-through voting being available to them on Election Day. Second, individuals who have already voted using drive-through voting may attempt to return on Election Day to make sure their votes are counted—creating a needless crisis.

A recent application of the *Purcell* principle is instructive. Two weeks ago, after the North Carolina State Board of Elections modified the deadline for receipt of absentee ballots, the Fourth Circuit refused injunctive relief. *See Wise v. Circosta*, No. 20-2104, 2020 WL 6156302, at *1-4 (4th Cir. Oct. 20, 2020). The Fourth Circuit stated that "*Purcell* strongly counsels *against* issuing an injunction here." *Id.* at *3. Tellingly, the Supreme Court also refused to grant an injunction. *Moore v. Circosta*, No. 20A72, 2020 WL 6305036 (Oct. 28, 2020). These denials represented disciplined and conscientious adherence to the *Purcell* principle.

Here, the Clerk implemented drive-through polling places in an exercise of his official duties under state law. Therefore, drive-through voting is the status quo, and federal courts should not interfere just before the final day of the election.

**B.    Plaintiffs' unjustifiable delay threatens to disenfranchise more than 100,000 voters, which is a compelling reason to deny relief.**

Because injunctive relief is subject to "well-established principles of equity," *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), the right to relief may be forfeited by an inexcusable delay that causes prejudice.  "Laches is founded on the notion that equity aids the vigilant and not those who slumber on their rights." *Nat'l Ass'n of Gov't Emp. v. City Pub. Serv. Bd.*, 40 F.3d 698, 708 (5th Cir. 1994); *see also Covey v. Arkansas River Co.*, 865 F.2d 660, 662 (5th Cir. 1989) ("It is a common maxim that equity is not intended for those who sleep on their rights."); *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1161 (5th Cir. 1982) (stating the elements of laches).  This obligation is one of the "traditional principles of equity jurisdiction" that is a "prerequisite" to the "availability of injunctive relief." *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318–19 (1999).

The laches principle applies in election cases.  *See*, *e.g.*, *Williams v. Rhodes*, 393 U.S. 23, 34–35 (1968) (upholding denial of injunctive relief to litigant seeking ballot access, despite a meritorious claim, based on the litigant's unjustifiable delay); *Perry v. Judd*, 471 Fed. Appx. 219, 224-26 (4th Cir. 2012) (same); *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (same).[3]

---

[3] *See also Fishman v. Schaffer,* 429 U.S. 1325, 1330 (1976) (Marshall, J., Circuit Justice); *Westermann v. Nelson,* 409 U.S. 1236, 1236–37 (1972) (Douglas, J., Circuit Justice).

9

The laches principle provides a compelling reason to deny injunctive relief. Plaintiffs did not file their federal complaint until October 28—just two days before the conclusion of the early voting and after more than 100,000 Texans had voted at drive-through polling places in reliance on the justifiable expectation that their votes would be counted in this uniquely consequential election. Plaintiffs cannot pretend that they lacked prior notice and a reasonable opportunity to file their claims earlier, nor can they deny the prejudice that would result from the relief they seek—potentially disenfranchising an astounding number of voters.

First, Plaintiffs inexcusably delayed the filing of their federal complaint. Plans to establish drive-through polling places were announced on June 15, 2020. Ex. 5. Throughout the summer, the Clerk held a series of "stakeholder meetings," which included representatives from the Harris County Republican Party, to discuss various issues related to the election—including the drive-through polling places. Ex. 6 ¶ 6. On July 10, the Clerk tested one drive-through polling place during the primary run-off election, and then issued a press release about it on July 22. Ex. 7. On July 29, the Harris County Attorney approved of drive-through voting. Ex. 8.

On August 25, the Harris County Commissioner's Court approved a plan to implement drive-through polling places for the general election, a decision that was publicized in the *Houston Chronicle.* Ex. 9. The Commissioners (a bipartisan body) unanimously approved the drive-through voting ("DTV") polling places. Ex. 10.

As Plaintiffs point out, the Clerk publicly announced his intention to make drive-through polling places available for the general election on September 10. Complaint ¶ 20.  Two weeks later, on September 29, the Commissioners accepted a $9.6 million grant that expanded drive-through voting locations.  Ex. 11.

Given the public nature of the drive-through voting initiative, there is no excuse for Plaintiffs' delay in this case.  If Plaintiffs believed they had justiciable federal constitutional claims, the time to complain was before early voting *began*— not two days before it *ended*.  There are more than 125,000 horses out of the barn. As of the end of early voting, 126,912 citizens had voted at drive-through locations, representing 10% of the 1,264,811 early votes.  Ex. 12, 17.  These voters cast ballots for candidates of both political parties in good-faith and justified reliance on the legality of the drive-through polling places.

It is no answer for Plaintiffs Hotze and Hemphill to claim that they sought mandamus relief from the Texas Supreme Court previously.  Even that petition was not filed until October 15, 2020—two days *after* the early voting period had begun. Ex. 13 at 5.  And it did not raise the federal constitutional claims raised in this case, but simply alleged violations of the Texas Election Code and the Texas Constitution. *Id*. at 6.  Plaintiffs have no justification for failing to file their federal claims earlier. Indeed, the Texas Supreme Court denied their first petition for mandamus relief on October 22, 2020, Ex. 2, yet they waited several more days to file this action.

Plaintiffs now ask this Court to issue an injunction that would both delay the counting of all the votes cast at these drive-through polling places, Complaint at 17, and "[r]eject any votes it finds were cast in violation of the Texas Election Code" (without explaining how a federal district court has the power to "reject" state votes). *Id.* According to Plaintiffs, *every vote* cast by an otherwise qualified voter who did not qualify for curbside voting was "cast in violation of the Texas Election Code" and should be thrown out. *Id.* It is no exaggeration to say that Plaintiffs are trying to deny more than 125,000 Texans their constitutional right to vote—a consequence that could not have occurred if they had sought relief prior to the early voting period. If Plaintiffs had sought relief promptly after plans for drive-through polling places were announced—and had prevailed on their claims—these 126,912 Texas citizens would have been able to make other voting arrangements. They have lost that chance through no fault of their own, and they should not lose it through the gamesmanship of a last-minute election lawsuit. This situation reflects the worst sort of prejudice that the laches doctrine forbids. Equity should not reward such gamesmanship.

Every American citizen who is qualified to vote has "a constitutional right to vote and to have their votes counted." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "Not only can this right to vote not be denied outright, it cannot, consistently with Article I, be destroyed . . ." *Id.* Yet that is the relief Plaintiffs request in this case. There is no more extreme form of prejudice. Laches bars their request for relief.

12

### C.     Plaintiffs cannot show a reasonable likelihood of success.

Even if injunctive relief were otherwise available under these circumstances, Plaintiffs could not meet their burden of showing a substantial likelihood of success. Doing so requires them to surmount not one, but two hurdles.  First, they must show that drive-through polling places are contrary to the Texas Election Code; second, they must show that the variance rises to the level of a federal constitutional offense. They cannot make either showing—much less both.

#### 1.     Drive-through polling places satisfy the Texas Election Code.

Plaintiffs cite a number of Texas statutes to support their challenge, but they distort the relevant provisions and ignore the provision that is directly applicable. Plaintiffs would have the Court believe the Harris County Clerk acted unilaterally to implement drive-through voting, but in fact, the Clerk only recommends locations for early voting; the actual legal approval is issued by the Commissioners Court. Tex. Elec. Code § 85.062(a)(1).  On August 25, the Commissioners Court approved the recommended early voting locations—including drive-through polling places— by a unanimous and bipartisan vote.  *See* Ex. 10.

Plaintiffs would have the Court believe the governing law is Section 64.009, but in fact, the location of early voting polling places is specifically governed by Tex. Elec. Code § 85.062(b).  That statute provides that an early voting polling place may be located "in any stationary structure," including a "movable structure."  *Id*.

13

Drive-through polling places comply with the statutory scheme authorized by the Legislature because they are "stationary structures" or "movable structures." There is no dispute that drive-through polling places are either stationary or movable (and must be one or the other), so the real question is whether they are "structures." That question is simple.

The Election Code does not define "structure," so the word is to be given its ordinary meaning. "Structure" is "[a]ny construction, or any production or piece of work artificially built up or composed of parts joined together in some definite manner. That which is built up or constructed; an edifice or building of any kind." *Structure*, Black's Law Dictionary 1424 (6th ed. 1990). The word ordinarily means "[s]omething constructed, such as a building."[4]

By this ordinary definition, there is no doubt the drive-through polling places qualify as "structures." Sturdy metal frames were constructed to form "structures" that cars can drive through in distinct lines to pass through individual voting stations. "Each drive-thru location is constructed of metal frames and durable tent covers covering a space of at least ten feet by twenty feet, with a ten-foot lane for a car to pass through." Ex. 6 at ¶ 7. They are not such a novelty; similar tent structures are also being used (without any legal challenges) at walk-in voting centers. *Id*. at ¶ 12; Ex. 16 at ¶ 12.

---

[4] https://ahdictionary.com/word/search.html?q=structure (last visited October 31, 2020).

14

What was legal last week will not become illegal tomorrow on Election Day. Polling places on Election Day are governed by a different statute, which states that each polling place "shall be located inside a building."  Tex. Elec. Code § 43.031(b). Once again, the Election Code does not define "building," so the word is to be given its ordinary meaning.  "Building" is a "[s]tructure designed for habitation, shelter, storage, trade, manufacture, religion, business, education, and the like.  A structure or edifice inclosing a space within its walls, and usually, but not necessarily, covered with a roof."  *Building*, Black's Law Dictionary 194-95 (6th ed. 1990).  The word ordinarily means "[s]omething that is built, as for human habitation; a structure."[5] Other Texas statutes define "building" in similar terms as "any enclosed structure" that is intended or designed "for use."  *See*, *e.g.*, Tex. Local Gov't Code § 214.231; Tex. Local Gov't Code § 233.0615; Tex. Penal Code § 30.01.

By this ordinary definition, there is no doubt the drive-through polling places qualify as "buildings."  As we have already explained, they are enclosed "structures" that are intended, designed, and built for a designated "use."  *E.g.*, *Myers v. State*, No. 05-92-00430-CR, 1992 WL 276459, at *2 (Tex. App.—Dallas 1992, no pet.) (holding a tent at the State Fair of Texas was a "building").  These tent structures have four walls, a roof, and a controlled entrance. The fact that the walls and roof are canvas rather than wood, brick, or stone is not legally significant.

---

[5] https://ahdictionary.com/word/search.html?q=building (last visited October 31, 2020).

Furthermore, the Texas Secretary of State is the State's chief election officer, responsible for uniformity in the application and interpretation of the Election Code. Tex. Elec. Code § 31.003.  The Senior Advisor of Voting Rights and Access for the Harris County Clerk's Office "sought advice from the SOS [Secretary of State] related to drive-thru voting over the course of multiple conversations." Ex. 6 at ¶ 5. "The SOS approved of the idea and made suggestions to keep the project in compliance with the law, such as providing access to all voters who come to a particular location whether in a vehicle, by bicycle, or on foot." *Id*.  This account was confirmed by testimony from the Texas Secretary of State Director of Elections in a prior case; he agreed that drive-through voting is "a creative approach that is probably okay legally" provided the polling place is associated with a building and is able to accommodate any voters who wish to vote.  Ex. 14 at 108-09.

Rather than engage seriously with the plain meaning of the statutory terms, Plaintiffs conflate drive-through polling places with so-called "curbside voting." But they are very different.  Curbside voting is a practice in which an election official brings a ballot to a voter at a location outside the polling station.  On the other hand, drive-through voting allows a voter to enter the polling place in his or her vehicle and the act of voting occurs inside, rather than outside, the polling place.  Therefore, Plaintiffs are attempting to mix apples and oranges.

The statutes governing "curbside voting" apply to all polling places and are designed to accommodate voters with particular physical disabilities or health risks. Plaintiffs recount the requirements for those special accommodations in some detail, but drive-through polling places do not offer the accommodations of curbside voting. Rather, they create temporary "structures" and "buildings" that allow any voter—not just voters with a particular disability or health condition—to vote within the polling place itself.  By trying to equate drive-through voting with curbside voting, Plaintiffs are simply knocking down a strawman.

Plaintiffs' complaint requests a review of "curbside voting applications." Complaint at 17.  But as the Harris County Administrator of Elections has explained, Ex. 16 at ¶ 2, there is no such thing as a "curbside voting application." *Id*. at ¶ 9. "No application is required for curbside voting.  The voter merely rings a buzzer and an election worker comes to the voter's car outside the polling location with a special ADA-compliant voting machine.  Voters are not questioned about their health status or the nature of their disability." *Id*.; *see also* Tex. Elec. Code § 64.009.

By contrast, "[d]rive-thru voting is a different physical layout of an in-person polling location, not a special accommodation for people with disabilities who cannot physically enter the polling places, where all election laws, including the accommodation of poll watchers, are in force." Ex. 16 at ¶ 10.

In short, drive-through polling places are just another form of polling place with a different layout and structure than traditional polling places; curbside voting is a method of voting that must be available at all polling places to accommodate voters with certain disabilities.  If a voter is physically unable to enter a polling place without personal assistance or a likelihood of injuring the voter's health, on the voter's request, an election officer shall deliver a ballot to the voter at the polling place entrance or the curb. Tex. Elec. Code § 64.009(a). While this restricted method of voting is colloquially known as "curbside voting," its actual physical application varies depending on the precise nature and physical layout of each polling location. On Election Day, Harris County will have approximately 800 polling locations and "[t]he physical layout and facilities in each will vary widely although every single location will offer curbside voting as Texas law requires."  Ex. 16 at ¶ 8.

Plaintiffs rely primarily on the particular statute governing curbside voting, Tex. Elec. Code § 64.009, which is inapplicable for the reasons we have explained. They also cite Tex. Elec. Code § 82.002, but that statute refers to mail-in voting and involves different eligibility criteria; it is also inapplicable.  And their citation to Tex. Elec. Code § 104.001 is baffling; that provision allows a voter who cannot use a voting machine at his or her precinct on Election Day due to a health condition or physical disability to vote instead at the main early voting polling place.  Once again, it is completely inapplicable here. *See* Ex. 16 at ¶ 11.

Finally, the politically-charged accusation that drive-through polling places were strategically placed in "Democratic strongholds," Complaint at 16, is not true. The Harris County Commissioners Court—a bipartisan body currently composed of three Democrats and two Republicans—*unanimously* approved the location of the drive-through polling places. *See* Ex. 10. And a map of Harris County reveals that the drive-through polling places are scattered around the county in a logical manner: one location is downtown (Toyota Center); five locations are distributed in a circle around Loop 610 (NRG Arena, Houston Community College West Loop South, Resurrection Metropolitan Church, Houston Food Bank, John Phelps Courthouse); and four are around Beltway 8 (Kingdom Builders Center, Houston Community College Alief Center, Fallbrook Church, Humble Civic Center). Ex. 15. Frankly, the idea that NRG Arena and Toyota Center are "Democratic strongholds" is absurd. Those two sites were selected for strictly neutral reasons, and two sites were located in each County Commissioner's precinct with their input and approval. Ex. 17.

In this respect, it is important to note that the only "evidence" Plaintiffs cite in support of their charged accusation is a summary of early voting statistics that includes no partisan identification of voters. *See* Complaint Ex. B. And obviously, hearsay attributed to a Republican state senator in a media report, Complaint at 16, is neither admissible nor competent evidence. There is no evidence to suggest that the drive-through voting locations created a disproportionate partisan breakdown.

19

### 2.   In any event, Plaintiffs cannot prevail on their claim to reject votes cast at drive-through polling places.

Regardless of the merits of Plaintiffs' complaints about drive-through voting, their ultimate request for relief—that all votes cast at drive-through polling places by voters who were ineligible for curbside voting be "[r]ejected," Complaint at 17—cannot succeed.  There has been no allegation of wrongdoing by the 126,912 voters who cast their ballots in this manner, and their votes must be counted.  Otherwise, those voters will lose their right to vote in this election through no fault of their own. When those citizens chose to utilize to drive-through voting, the practice had been approved by the Secretary of State and the Texas Director of Elections, used in a prior election without legal incident, and permitted to proceed by the Texas courts. *See In re Hotze*, 20-0819, 2020 WL 6193918, at *1 (Tex. Oct. 22, 2020) (denying both petition for writ of mandamus and motion for emergency stay); *In re Pichardo*, 14-20-00697-CV, 2020 WL 6051700, at *3 (Tex. App.—Houston [14th Dist.] Oct. 14, 2020, mandamus denied).  These voters had every reason to believe their votes would be counted—and the law provides that they must be counted.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  At bottom, this extraordinary case is about nothing less than that most precious right.

20

Texas courts likewise hold "the right to vote is fundamental, as it preserves all other rights." *Andrade v. NAACP of Austin,* 345 S.W.3d 1, 12 (Tex. 2011) (citations omitted); *see also In re State*, 602 S.W.3d 549, 572 (Tex. 2020). As such, this right must be "zealously safeguarded," *Thomas v. Groebl*, 212 S.W.2d 625, 630 (Tex. 1948), through a "well established rule of construction" that requires courts to construe statutes as broadly as possible in favor of the right to vote. *Id.*

Mindful of this principle, when the Texas Legislature intends for violations of the Election Code to invalidate a vote, it uses unambiguous and mandatory language. *See, e.g.*, Tex. Elec. Code §§ 41.008 ("An election held on a date not permitted by this subchapter is void."), 65.010 (listing types of ballots that "may not be counted"), 86.006(h) (ballots returned in violation of that section "may not be counted"). According to the Texas Supreme Court, only these mandatory provisions permit a court to reject a ballot; merely directory provisions do not. *See Ramsey v. Wilhelm*, 52 S.W.2d 757, 759 (Tex. Civ. App.—Austin 1932, writ ref'd)[6] (holding that "in the absence of any showing of fraud, or reasonable indication that such will has not been fairly expressed and the evidence thereof properly preserved, the courts have been liberal in construing and enforcing as directory only the provisions of the election laws which are not upon their face clearly mandatory.").

---

[6] A "writ refused" case from this era "carries the imprimatur of Texas Supreme Court precedent." *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 754 n.52 (Tex. 2006).

As one Texas court has explained, the Texas election laws are categorized as "either mandatory or directory," and "after the voters have acted by voting" statutes "will and ought to be construed as being directory on easier terms than provisions of election laws governing what is required of candidates." *Branaum v. Patrick*, 643 S.W.2d 745, 749 (Tex. App.—San Antonio 1982, no writ).  This is appropriate "because the right to vote is a fundamental one." *Id.*

None of the statutes invoked by Plaintiffs provides that a ballot or election may be invalidated in the event of a failure to comply.  They are purely directory, not mandatory, so Texas law dictates that they are not a basis to invalidate a vote. *Ramsey*, 52 S.W.2d at 759.  Texas courts have held repeatedly that even when an election has used a procedure later found to be in violation of the Election Code, votes cast under that procedure must still be counted—including in cases involving disputes about polling places.  *See*, *e.g.*, *Honts v. Shaw*, 975 S.W.2d 816, 821-22 (Tex. App.—Austin 1998, no pet.).  To hold otherwise would punish innocent voters for the mistakes of election officials.  *See Honts*, 975 S.W.2d at 822 (warning that "a sanction for the sins of the . . . official should not [be] visited upon the voter") (quoting *Alvarez v. Espinoza,* 844 S.W.2d 238, 243 (Tex. App.—San Antonio 1992, writ dism'd w.o.j.)); *see also Little v. Alto Indep. Sch. Dist.*, 513 S.W.2d 886, 890 (Tex. Civ. App.—Tyler 1974, no writ); *Altgelt v. Callaghan*, 144 S.W. 1166, 1171 (Tex. Civ. App.—San Antonio 1912, writ dism'd w.o.j.).

The U.S. Supreme Court recently held the same. *See Andino v. Middleton*, 592 U.S. ___, 2020 WL 5887393, at *1 (2020). In *Andino*, the Court stayed an order that would eliminate the witness requirement for absentee ballots in South Carolina, effectively keeping that witness requirement in place for the 2020 general election. The briefing noted that thousands of ballots without witness signatures had been cast in reliance on the lower court's ruling, and the Court ruled that "any ballots cast before this stay issues and received within two days of [the Court's] order [could] not be rejected for failing to comply with the witness requirement." *Id.*

This Court should rule the same. Even if a court ultimately concluded that drive-through voting does not comply with the Texas Election Code—despite the preclearance of the Secretary of State's Elections Division and the refusal of the Texas Supreme Court to reach that conclusion when given an opportunity to do so—that ruling would *not* allow the ballots cast by 126,912 citizens under that procedure to be "rejected." Complaint at 17. The magnitude of this issue cannot be overstated. The group of voters Plaintiffs seek to disenfranchise is larger than the population of most Texas cities—including, for example, Pearland, Sugar Land, College Station, Beaumont, and The Woodlands. Such an extreme action would threaten to change the outcome of numerous races on the ballot, which is the last thing a federal court should entertain doing in the middle of the election. The Court should immediately deny relief with respect to this incendiary request for relief.

23

3.      **Even if Plaintiffs' interpretation of Texas law were correct, their claims do not raise any substantial federal question or invade any protected constitutional right.**

Even if Plaintiffs could establish that drive-through voting is a violation of the Texas Election Code, that conclusion would be insufficient to state a federal claim. Thus, to demonstrate a substantial likelihood of success, they must also demonstrate that the federal claims they have alleged are substantially likely to succeed.

Plaintiffs' first federal claim alleges that drive-through voting is not only contrary to the Texas Election Code but rises to the level of a violation of the Elections Clause, which provides that the "Times, Places, and Manner" of elections for United States Senators and Representatives "shall be prescribed in each State by the Legislature thereof."  U.S. Const. art. I, § 4, cl. 1.  Plaintiffs build their argument on a concurring opinion in *Bush v. Gore*, 531 U.S. 98 (2000), which posited that a "significant departure" from the scheme prescribed by a state legislature would raise "a federal constitutional question."  *Id.* at 113 (Rehnquist, C.J., concurring).

That theory did not command a majority in *Gore*, and it is inapplicable here. For one thing, as noted, Plaintiffs lack standing to assert an Elections Clause claim. For another, the facts of this case do not involve the review of a state-court decision, nor do they approach the sort of "significant departure from the legislative scheme," *id.*, that would rise to a constitutional violation.  Obviously, it cannot be the law that every dispute about state election law presents a federal constitutional question.

24

The practices in question here represent a reasoned interpretation of the relevant provisions of the Texas Election Code, and far from being a departure from the legislative scheme, they were approved in advance by the Elections Division of the Texas Secretary of State—the state official charged with maintaining uniformity in the application and interpretation of the Election Code.  Tex. Elec. Code § 31.003. Even if there is some room for a debate about whether drive-through polling places are permissible "structures" and "buildings" under the Election Code, that debate is hardly the sort of "significant departure" that Chief Justice Rehnquist had in mind.

The *Gore* concurrence contended that "with respect to a Presidential election, the court must be both mindful of the legislature's role under Article II in choosing the manner of appointing electors *and deferential to those bodies expressly empowered by the legislature to carry out its constitutional mandate.*"  *Id.* at 114 (emphasis added).  Here, the Harris County Commissioners Court (which determines temporary polling places and unanimously voted to approve drive-through voting) and the Clerk (who administers the election) *are* "those bodies expressly empowered by the legislature to carry out its constitutional mandate."  This is not a case in which "[t]he general coherence of the legislative scheme" has been "altered" by any court (or other state actor) "so as to wholly change the statutorily provided apportionment of responsibility" regarding election procedures.  *Id.*  In truth, the *Gore* concurrence supports deference to the public officials' discharge of their legal duties.

Plaintiffs' equal protection claim alleges that Harris County is the only county that has adopted drive-through voting and "surrender[ed] the safeguards associated with curb-side voting while other counties maintain the integrity of the ballot box." Complaint at 11-12. That claim is factually untrue,[7] and legally insubstantial. Defendant has authority only over elections in Harris County, and as Plaintiffs note, he is treating every Harris County voter identically. The fact that voters elsewhere are subject to different voting procedures does not mean the Harris County Clerk's identical treatment of every Harris County voter is a violation of equal protection. *Citizen Ctr. v. Gessler*, 770 F.3d 900, 917–19 (10th Cir. 2014). At least with respect to a county official, the Equal Protection Clause "requires only that each county treat similarly situated voters the same." *Id*. at 917. "In the absence of an allegation that [the Clerk] treated voters in a single county differently, [Plaintiffs have] failed to state a valid equal protection claim against" the Harris County Clerk. *Id*. at 919.

Plaintiffs rely on the per curiam majority opinion in *Gore*, but the Court noted that "[t]he question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections." *Gore*, 531 U.S. at 109. Here, that is precisely the question—whether Texas counties may implement drive-through voting consistent with the Texas Election Code.

---

[7] Plaintiffs are mistaken to assert that Harris County is the only county using drive-through voting. http://users.neo.registeredsite.com/2/5/8/19955852/assets/EV_HOURS38404.pdf (Calhoun Cty.).

This question, while undoubtedly important to the citizens of Texas, is not a matter of constitutional significance. *Gore* involved "a situation where a state court with the power to assure uniformity has ordered a statewide recount with minimal procedural safeguards." *Id.* at 109. The Court held that the Florida Supreme Court had fashioned an ad hoc remedial scheme that lacked "the rudimentary requirements of equal treatment and fundamental fairness." *Id.* This drive-through voting plan, which was carefully conceived and pre-approved by election officials, does not lack "the rudimentary requirements of equal treatment and fundamental fairness." *Id.* Far from it: every Harris County voter is treated fairly and equally.

As the Proposed Intervenors have explained, *Gore* involved a situation in which counties were using "varying standards to determine what was a legal vote," *id.* at 107, which meant that ballots were being "valued" differently. *Id.* at 104-05. That is not the case here; every ballot is being valued the same. *Wise v. Circosta*, No. 20-2104, 2020 WL 6156302, at *5 (4th Cir. Oct. 20, 2020). The allegations in the complaint do not state a viable equal protection claim.

**D.      Granting a preliminary injunction in the midst of the election would disserve the public interest.**

Finally, even if Plaintiffs could show a substantial likelihood of success and an irreparable injury—which they lack, since they have no individual injury at all—injunctive relief would be unwise because of the public interest in completing the election and avoiding politicization of the courts.

27

In preliminary injunction analysis, the third factor is whether the plaintiff's injury outweighs the threatened harm to the party to be enjoined; the fourth factor is whether granting a preliminary injunction will "not disserve" the public interest. *USI Sw.*, 2020 WL 2220573, at *3 (Hanen, J.). "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs claim that in balancing the equities this Court should only consider the injury to them and argue there would be no harm to the Clerk. Doc. No. 4 at 12. But this argument ignores the severe harm to the public interest and the voters.

The Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). Plaintiffs' requested relief would affect 126,912 votes cast in early voting; those voters would lose their constitutional right to vote in this epochal election. Indeed, the Proposed Intervenors have provided affidavits from drive-through voters who voted in reliance on Harris County's authorization—one of whom is out of state and could not easily return now to cast a second ballot. *See* Doc. No. 13-1 at 18-19; Doc Nos. 13-7 to 13-11. They are the faces of more than 125,000 Texas citizens.

Courts have held repeatedly that disenfranchisement is an irreparable injury, tipping the balance powerfully against the most extreme injunctive relief requested by Plaintiffs. *See Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986).

28

Similarly, even if a preliminary injunction were limited to segregating the drive-through voting records and not counting them on Election Day—or even allowing the possibility that they might not be counted—the harm would be severe. All voters who have voted using the drive-through procedure would be left in limbo. As Proposed Intervenors point out, such voters realistically would be unable to cast a second ballot due to the possibility of criminal prosecution. *See* Doc. No. 13-1 (citing Tex. Elec. Code § 64.012). They would be left to wonder whether their votes would be counted. Confidence in the democratic process would be shaken. Thus, Plaintiffs are wrong to contend there is no countervailing harm.

Next, Plaintiffs claim that the public interest would be served by an injunction. On the contrary, the public interest favors non-interference with official procedures that were adopted and publicized by Harris County election officials months ago— including drive-through polling places. Avoiding voter confusion and disruption is "within the public interest given the extremely fast-approaching election date." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 412 (5th Cir. 2020).

Indeed, in analyzing this factor, both the Fifth Circuit and other courts have relied on the *Purcell* principle. Avoiding interference and alteration of election rules so close to the election date is an important priority in the public-interest analysis. *Id.*; *Wise*, 2020 WL 6156302, at *7 ("the balance of equities is influenced heavily by *Purcell* and tilts against federal court intervention at this late stage").

In summary, deference to publicly-elected officials is the appropriate course. The Clerk implemented drive-through voting after consultation and approval from the Secretary of State, and the Texas Supreme Court has twice declined to interfere. The fact that the final arbiter of the Texas Election Code found no justification for interfering with drive-through polling places—based on the same legal arguments— in the middle of the election is an unmistakable indication that the public interest is best served by allowing the election to proceed without interference.

## CONCLUSION

Plaintiffs' request for a preliminary injunction should be denied.

Respectfully submitted,

*/s/ Richard Warren Mithoff*
Richard Warren Mithoff
*Attorney of Record*
Texas Bar No. 14228500
Federal ID No. 2102
rmithoff@mithofflaw.com
Janie L Jordan
Texas Bar No. 11012700
Federal ID No. 17407
jjordan@mithofflaw.com
Sherie Potts Beckman
Texas Bar No. 16182400
Federal ID No. 11098
sbeckman@mithofflaw.com
MITHOFF LAW
500 Dallas Street, Suite 3450
Houston, Texas 77002
Telephone:      (713) 654-1122
Facsimile:      (713) 739-8085

OF COUNSEL:
Joseph R. Alexander, JR.
THE ALEXANDER FIRM, PLLC
Texas Bar No. 00995150
Federal ID No. 1368
Two Greenway Plaza, Suite 650
Houston, Texas 77046
Telephone:      (713) 344-2094
Facsimile:      (713)513-5543
joe@alexanderfirmpllc.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via the Court's electronic filing system pursuant to the Federal Rules of Civil Procedure on November 1, 2020.

*/s/ Richard Warren Mithoff, Jr.*
Richard Warren Mithoff, Jr.