IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| STEVEN HOTZE, M.D., WENDELL CHAMPION, HON. STEVE TOTH, AND SHARON HEMPHILL, <br><br> Plaintiffs, <br><br> v. <br><br> CHRIS HOLLINS, in his official capacity as Harris County Clerk, <br><br> Defendant. | Civil Action <br><br> No. 4:20-cv-03709-ASH |

**SECOND AMENDED BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

Plaintiffs Steven Hotze, M.D., Wendell Champion, Hon. Steve Toth, and Sharon Hemphill hereby submit their brief in support of their Motion for a Preliminary Injunction against Chris Hollins, in his official capacity as Harris County Clerk ("Defendant").

## INTRODUCTION/BACKGROUND

Under Section 83.002 of the Texas Election Code, Defendant has the responsibility of enforcing the election laws to ensure a fair and honest election in Harris County. Despite the fact that the Texas Election Code restricts curbside voting to specific and narrowly defined categories of voters, and fails to recognize drive-thru voting, Defendant has implemented a drive-thru voting scheme that is violating the law. Defendant is using the COVID-19 pandemic as his pretext of permitting any and all Harris County registered voters to vote curbside or, as Defendant calls it: drive-thru.

Drive-thru voting is illegal and unconstitutional for several reasons. It compromises the integrity of the ballot in terms of who voted, akin to allowing multiple people into a polling booth

at the same time despite a lack of any disability. Drive-thru voting also compromises the secret ballot, as when car pools of workers or families vote in that manner. The Texas legislature has already decided, in its wisdom, not to allow drive-thru voting except for the disabled. Drive-thru voting allows people to be influenced while they are voting, such as by smart phones or the radio, contrary to rules against politicking in proximity to a polling booth. More generally, drive-thru voting cheapens the election process to the detriment of in-person voting, thereby detracting from the traditional respect for Election Day. Drive-thru justice would be unthinkable, and voting requires adhering to standards of integrity too.

Drive-thru voting further interferes with the essential role of a "election watcher," who is "a person appointed ... to observe the conduct of an election on behalf of a candidate, a political party, or the proponents or opponents of a measure." Tex. Elec. Code § 33.001. Under chapter 33 of the Texas election code, a watcher is entitled to:

- "observe any activity conducted at the location at which the watcher is serving," *id.* § 33.056(a);
- "sit or stand conveniently near the election officers conducting the observed activity," *id.*;
- "sit or stand near enough to the member of a counting team who is announcing the votes to verify that the ballots are read correctly or to a member who is tallying the votes to verify that they are tallied correctly," *id.* § 33.056(b);
- accompany the officer in making the delivery of election records, *id.* § 33.060.

Chapter 33 sets forth criminal penalties for someone who violates a watcher's ability to complete his or her duties, and violations are Class A misdemeanors. *Id.* § 33.061. But drive-thru voting impedes this important function of election watchers, which is necessary to maintain the integrity of the election process for voters and candidates alike. The attached affidavit of Early Voting Election Clerk, Genevieve Mora, identifies issues occurring at drive-thru voting locations, including, but not limited to, people in the car assisting the voter or instructing the voter on how to vote, voters using cell phones and cameras to broadcast themselves voting, a voter putting the

process on Snapchat Live and filming their vote as she was driving thru, and voters talking on the cell phone while voting. (Exhibit "D")

On May 15, 2020, the Texas Supreme Court rejected Defendant's contention that a voter's lack of immunity from COVID-19 and concern about contracting it at a polling place constitutes a "disability" within the meaning of the statute permitting a voter to cast a ballot by mail. *In re State*, 602 S.W.3d 549, 550 (Tex. 2020). The exact same rationale applies with equal force to Defendant's latest attempt to ignore the narrow confines of the carefully defined standards for the three types of situations where a voter may properly vote curbside under the Texas Election Code. None of those instances are satisfied by a voter's lack of immunity to COVID-19, or by a generalized subjective fear of contracting a virus, or by a desire for "convenience" or to enjoy the "comfort" of one's vehicle while voting.

Defendant Hollins' drive-thru voting scheme allows any and all Harris County registered voters – regardless of whether they are permitted to do so under the Texas Election Code – to engage in early and election day drive-thru voting. Defendant Hollins who is a Democrat and currently serves as Deputy Vice-Chair of Finance for the Democratic Party of Texas, has identified ten (10) drive-thru voting locations and placed nine (9) of the locations in heavily Democratic areas. (Exhibit "A") Through the Texas Election Code, the Legislature chose not to recognize drive-thru voting; however, the Texas Legislature did expressly create a narrowly defined exception to voting in person for those who are physically unable to enter the polling place without personal assistance or likelihood of injuring the voter health - "curb-side voting." Tex. Elect. Code §§64.009, 82.02, and 104.001- 104.005. The Legislature restricted curbside voting to three distinct categories: (i) presents sick at the time of the vote; (ii) a voter has a physical condition requiring personal assistance (e.g., is physically handicapped); or (iii) voting inside the polling location

would create a likelihood of injuring the voter's health. *Id*. Additionally, if a voter qualifies as disabled under Texas Election Code § 82.002 the voter is eligible to vote by mail.

By indiscriminately encouraging and allowing any and all Harris County registered voters to cast their ballots curbside on this invalid basis, Defendant's ultra vires act regarding drive-thru voting is a violation of federal law and must be stopped. By circumventing the Texas Legislature and implementing a manner of voting not recognized in the Texas Election Code, Defendant is violating Art. I, §4, Cl. 1 of the United States Constitution. Additionally, by adopting a manner of voting that is inconsistent with the Texas Election Code and not adopted by any other county in Texas, Defendant is violating the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Accordingly, Plaintiffs seek preliminary injunction relief to compel Defendant to perform his nondiscretionary, ministerial duties and enjoin blanket drive-thru voting and only allow curbside voting for those Harris County registered voters who have submitted sworn applications which facially satisfy at least one of the specific categories permitting curbside voting under the Texas Election Code.

On Saturday, October 31, 2020, all the Judge's Booth Controllers ("JBC") from early voting will be delivered to central count at NRG. (Exhibit "A") Seals will be broken and the memory cards - Mobile Ballot Box ("MBB") will be accessed to count the number of ballots contained in each MBB-not tally the vote. (Exhibit "A") On the morning of November 3, 2020, the same MBBs will be connected to the Tally machine to download the actual ballots contained. (Exhibit "A") The Tally machine will then conduct the counting/tabulation process for early votes utilizing the drive-thru process. (Exhibit "A") After 7:00 p.m. on November 3, 2020, Defendant will enter the MBBs from election day votes at drive-thru locations into the Tally machine to conduct the counting/tabulation of election day votes at drive-thru locations. (Exhibit "A")

Accordingly, Plaintiffs are asking this Court to grant a preliminary injunction requiring all memory cards from the ten (10) drive-thru voting locations be secured and that Defendant be enjoined from entering or downloading the MBBs from early or election day voting into the Tally machine and/or tabulating any drive-thru votes until this Court issues an order on the relief requested in Plaintiffs' Original Complaint and request for injunctive relief.

Unless stopped, illegal votes will be cast and counted in direct violation of the Texas Election Code and the United States Constitution and result in the integrity of elections in Harris County being compromised.

## THE PARTIES

Plaintiff Steven F. Hotze, MD, is a registered voter in Harris County and will be voting in the general election. Plaintiff Hon. Steve Toth is a member of the Texas House of Representatives, representing District 15. Representative Toth is on the November 3, 2020 ballot. Plaintiff Wendell Champion is the Republican nominee for Texas' 18th Congressional District. He is on the ballot in the general election on November 3, 2020. Plaintiff Sharon Hemphill is a registered voter in Harris County. Sharon Hemphill is the Republican nominee for judge of the Texas 80th District Court, Harris County, Texas. She is on the ballot in the general election on November 3, 2020. She advanced from the Republican primary on March 3, 2020.

Defendant Hon. Chris Hollins is the Harris County Clerk and is sued here in his official capacity only.

## STANDARD OF REVIEW

A. Plaintiffs seek preliminary injunctive relief to prevent irreparable harm to it and its members, and to prevent violations of their constitutional rights caused by the arbitrary and irrational actions by Defendant.

B. "To obtain a preliminary injunction, the moving party must establish four factors:

5

(1) a substantial likelihood of success on the merits, (2) a substantial threat that failure to grant the injunction will result in irreparable injury, (3) the threatened injury outweighs any damage that the injunction may cause the opposing party, and (4) the injunction will not disserve the public interest." *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991) (citing *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 809 (5th Cir. 1989)). *See also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). "The decision to grant or deny a preliminary injunction lies within the discretion of the district court." *Lakedreams*, 932 F.2d at 1107.

## ARGUMENT

### I. HOLLINS IS VIOLATING THE UNITED STATES CONSTITUTION

Defendant Hollins' drive-thru voting scheme violates Article I, Section IV, Clause 1 of the United States Constitution in that Hollins redefines the manner of conducting elections in Harris County contrary to the Texas Election Code. Additionally, Hollins violates the Fourteenth Amendment's Equal Protection Clause by adopting a manner of voting in Harris County that has not been adopted by other Texas' counties.

**A. The Election Clause Requires this Court to Uphold the Manner of Voting Defined by the Legislature in the Texas Election Code.**

The Constitution's Elections Clause directs that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof," subject to the directives of Congress. U.S. Const. Art. I, § 4, Cl. 1. Because federal offices "arise from the Constitution itself," any "state authority to regulate election to those offices . . . had to be delegated to, rather than reserved by, the States." *Cook v. Gralike*, 531 U.S. 510, 522 (2001). The Constitution effected such delegations to State Legislatures through the

6

Electors and Elections Clauses. See U.S. Const. Art. II, § 1, Cl. 2; id. Art. I, § 4, Cl. 1. The Elections Clause vests State Legislatures, subject to Congress' enactments, with authority "to provide a complete code for congressional elections." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); see also *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 826 (2015) (Roberts, C.J., dissenting) (noting that the Elections Clause "imposes a duty on States and assigns that duty to a particular state actor"). This "broad power to prescribe the procedural mechanisms for holding congressional elections," *Cook v. Granlike*, 531 U.S. 510, 523 (2001) (internal quotation marks omitted), includes authority to enact "the numerous requirements as to the procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved," *Smiley*, 285 U.S. at 366; *Cook,* 531 U.S. at 523–24; see also *Storer v. Brown*, 415 U.S. 724, 730 (1974) (stating that state legislatures may enact election laws in order to ensure that elections are "fair and honest" and that "some sort of order, rather than chaos, is to accompany the democratic process"). This sweeping grant of authority means that "the text of [state] election law itself, and not just its interpretation by the courts of the States, takes on independent significance," *Bush v. Gore*, 531 U.S. 98, 112–13 (2000) (Rehnquist, C.J., concurring), and the federal Constitution "operate[s] as a limitation upon the State in respect of any attempt to circumscribe the [delegated] legislative power," *Palm Beach Cnty.*, 531 U.S. at 76; *McPherson*, 146 U.S. at 25. The United States Supreme Court has made it clear that "[a] significant departure from the legislative scheme for electing U.S. Representatives—including when such departure is carried out by the state judiciary—thus presents a federal constitutional question." *Bush*, 531 U.S. at 113 (Rehnquist, C.J., concurring); see also *Palm Beach Cnty.*, 531 U.S. at 76; *McPherson*, 146 U.S. at 25.

Here, the Texas Legislature has created a detailed statutory scheme related to curbside

7

voting to govern the conduct of federal elections. Defendant Hollins has significantly departed from the legislative scheme regarding curbside voting. By allowing Hollins to significantly alter the manner of voting that has not been prescribed by the Legislature, Hollins' drive-thru voting scheme violates the United States Constitution Art. I, § 4, Cl. 1.

### 1. The Texas Election Code Should Be Strictly Construed.

Court have "stated in no uncertain terms that county election officials possess only those powers 'granted in express words' or 'necessarily or fairly implied in an express grant.'" *In re Hotze*, No. 20-0819 (October 22, 2020) (Devine, J., dissenting) (quoting *State v. Hollins,* No. 20-0729, 2020 WL 5919729, at *4 (Tex. 15 Oct. 7, 2020) (per curiam) (internal quotations omitted)). As Justice Devine writes in his dissent in *In re Hotze*, "These implied powers are themselves narrow—they must be 'indispensable,' 'not simply convenient.'" *Id.* The powers are governed by a "lengthy, detailed, and comprehensive Election Code." *Id.* at *2. Defendant Hollins' acts are outside the scope of the Election Code and constitute ultra vires conduct that undermine the integrity of the election process. See *Richardson v. Hughs*, No. 20- 50774, 2020 WL 6127721, at *1–2 (5th Cir. Oct. 19, 2020). "Though certain enumerated powers may create a narrow range of implied powers, the Legislature's silence on an issue raises the presumption that it has not granted that power." *In re Hotze*, No. 20-0819 (October 22, 2020) (Devine, J., dissenting). Nothing in the Texas Election Code allows for Hollins' drive-thru voting.

### 2. Hollins Attempts to Redefine Polling Location.

Under Defendant Hollins' drive-thru voting scheme, a car is turned into a polling location. Specifically, to drive-thru vote, the voter never exits the vehicle. (Exhibit "A") Instead, the voter sits in their car as the e-slate is hand delivered to the voter who then casts their vote within the confines of their vehicle. (Exhibit "A") It should be noted that many times these votes are cast by

8

numerous people in one car, eliminating the confidentiality surrounding one's vote. (Exhibit "A") The garages, tents, canopies, and other "coverings" the car drives into are not the actual polling location - the polling place is the car. The e-slate is physically placed in the car, the vote is cast in the car, and the voter remains in the car. (Exhibit "A").

A car is not a polling place. If a car is a polling place, Harris County now has millions of voting locations around the county that change locations throughout the day. Attached as Exhibit "B" are photos of Harris County voters utilizing "drive-thru" voting. The Election Code mandates that a registered voter cast a ballot in a "voting station" at a "polling place." See TEX. ELEC. CODE §§ 64.001, 64.009(a).

Qualified individuals may request their ballot curbside in a vehicle on election day and throughout the early voting period. *Id*. § 64.009(a). This exception applies only to those physically unable to enter the polling place without assistance or for whom a likelihood of injury exists. *Id.*; see also *In re State*, 602 S.W.3d 549, 550 (Tex. 2020) (a voter's general fear or lack of immunity from COVID-19 is not a "disability" as defined by the Election Code). Otherwise, voting is to take place in a "polling place." TEX. ELEC. CODE § 64.009(a). Defendant assumes that rows of semi-permanent tents where election officers stand awaiting dozens of cars, inside of which any voter may cast a ballot, qualify as a "polling place." In his dissent in *In re Hotze*, which only raised state law issues, Justice Devine rejects Hollins' definition, stating, "I struggle to see how the Election Code contemplates such a novel concoction. Hollins stretches the text of the Code beyond its historical and common-sense understanding." *In re Hotze*, No. 20-0819 (October 22, 2020) (Devine, J., dissenting).

The Texas Election Code states that polling locations "may be located in any stationary structure," including a "movable structure." *Id*. § 85.062(b). Hollins has previously argued that

9

these "tents" satisfy the requirements of movable structure. However, as Justice Devine has stated, "[T]he Texas Election Code likely contemplates that 'structure' is a place one enters to get to the polling place; the structure itself is not the polling place." *In re Hotze*, No. 20-0819 (October 22, 2020) (Devine, J. dissenting). The Texas Election Code prohibits electioneering "within 100 feet of an outside door through which a voter may enter the building or structure in which the early voting polling place is located." Texas Elec. Code § 85.036(a) (emphasis added). As Justice Devine concluded, "The prepositional phrase 'in which' indicates that the polling place is to be inside of a building or structure. The structure itself cannot be the polling place and the voting station rolled into one. Even harder to understand is how one's vehicle could qualify as a 'polling place,' as it is not a 'structure' as commonly understood. Nor can one's vehicle be a 'voting station,' which is a specific location designated for voters to cast a ballot. Station, WEBSTER'S NEW COLLEGIATE DICTIONARY (1975) ("[A] place established to provide a public service." (emphasis added))." *Id*. Hollins' expansion of the statute manifests itself in the absurd result that every voter's vehicle is a "polling place" or "voting station." *Id*.

### 3. **Texas Attorney General Recently Addressed Drive-Thru Voting**.

On October 16, 2020, Attorney General Ken Paxton addressed the issue of "drive-thru" voting. (Exhibit "C") In his letter General Paxton states, among other things, that Texas Election Code "makes no provision for 'drive-thru' voting centers at which any voter may cast a ballot from his or her vehicle." (Exhibit "C")

### 4. **The Texas Legislature has Rejected "Drive-Thru" Voting.**

Legislators have previously attempted to amend the Texas Election Code to allow a form of Respondent Hollins' "drive-thru" voting scheme. During the 2019 legislative session, legislation was proposed to allow polling places to accommodate parents with young children, HB

2898. (Exhibit "G") Because Texas law required curbside voting for people with disabilities, HB 2898 left it up to local election officials to decide whether to offer curbside voting for parents with young children. (Exhibit "G") The bill also created a study to be performed by the Texas Secretary of State's office that would evaluate the best practices for curbside voting for people with children and report it to the legislature by December 2020. (Exhibit "G") The Texas House approved the bill that supporters believed would increase voter turnout by allowing parents with children younger than five (5) years old to participate in curbside voting. (Exhibit "G")

The argument for the bill was similar to that made by Defendant Hollins as a justification for his drive-thru voting scheme. On May 8, 2019, the House gave the bill final approval in a 90-52 vote. However, the Texas Senate did not pass the bill.

Here, Hollins is implementing a form of "drive-thru" or curbside voting that is much broader than the one previously rejected by the Legislature. A pandemic should not be a license for a county clerk to turn into a super-legislature. If the Texas Legislature has effectively rejected Hollins' scheme, so too should this Court.

### 5. Drive-Thru Voting Locations Placed in Democratic Strongholds.

Nine of the ten "drive-thru" voting locations in Harris County are placed in areas that vote heavily Democratic. (Exhibit "A") State Sen. Paul Bettencourt (R-Houston) recently noted nine of the 10 drive-thru voting locations are in Democrat areas of the county, adding that "nothing in the Texas election code allows Mr. Hollins to do this setup." Erin Anderson, Texas AG: Legal Action for Unlawful Drive-Thru Voting, Texas Scorecard, October 20, 2020.

### B. Hollins' Drive-Thru Voting Scheme Violates the Fourteenth Amendment.

The Fourteenth Amendment to the United States Constitution provides, "No State shall...deny to any person...the equal protection of the laws." U.S. Const. amend. XIV, § 1. Harris

County is the only Texas County that has adopted drive-thru voting. (Exhibit "A") By using different criteria for voting and allowing a new form of voting to occur only in Harris County, Hollins is violating the Equal Protection Clause. *Bush v. Gore*, 531 U.S. 98 (2000).

Hollins violates the Equal Protection Clause, in that Harris County, unlike other counties, surrenders the safeguards associated with curbside voting while other counties maintain the integrity of the ballot box by complying with the strict requirements imposed by the Texas Legislature in §§ 64.009, 82.02, and 104.001-104.005 of the Texas Election Code. The Unites States Supreme Court's per curiam majority opinion in *Bush v. Gore* eviscerated the distinction between nuts-and-bolts questions and big picture questions by holding that Florida law, at least as construed by the Florida Supreme Court, violated the Equal Protection Clause of the Fourteenth Amendment. 531 U.S. 98 (2000). The Court held that a state violates equal protection when it fails to have uniform standards for the recounting of votes during a statewide election contest. *Id.* at 109. The opinion makes it clear that disparity regarding the means of voting is a justiciable question. Here, Hollins has implemented a form of voting that is unique to Harris County and differs from the remaining 253 counties in the state of Texas. (Exhibit "A")

II. **EACH OF THE ELEMENTS OF A PRELIMINARY INJUNCTION ARE SATISFIED HERE.**

The first – and most important – factor is the likelihood of movants' prevailing. *Winter,* 555 U.S. at 20.

A. **Plaintiffs Have a Substantial Likelihood of Prevailing on the Merits Because Defendant is Violating the Law.**

Having established a likelihood of prevailing on the merits, Plaintiffs now establish that the remaining factors point toward this Court's granting interim relief while this case proceeds to the merits.

For example, on November 1, 2020, the Chairman of the Harris County Republican Party Ballot Security Committee, Alan Vera, asked the Director of Elections for Harris County, Mr. Winn, the following:

> Mr. Winn:
>
> We have knowledge that in Harris County, apparently, the voting booth (eSlate) was not connected back to the JBC after every vote was cast on the eSlate in the drive through locations. Presumably, this activity resulted in not all of the votes being captured on the JBC associated with each eSlate. Please confirm this report.
>
> We also understand that there was one eSlate for each JBC machine at the drive through locations. Please confirm.
>
> We are very concerned about the accurate counting of all of the votes and the documentation that all of the votes from the eSlate machines have been handled through a quarantine process and that the medium you used to capture the votes yesterday was set to zero. Please confirm.
>
> You have offered to re-download all of the votes from the drive-through in the presence of the Central Count personnel. Please do perform that task of re-entering the votes from those machines in the presence of Central Count personnel and poll watchers before noon on Monday 11-2-20. Please also allow Central Count to confirm that the medium into which the information is downloaded into is set to zero. Please confirm.
>
> Upon completion, we request that all of the JBCs and eSlates used at the drive through locations be quarantined until the end of this calendar year, until this matter is resolved. Please confirm.
>
> Please also provide any documentation confirming and/or denying that these e-slates during the 3-week period of early voting were secured overnight, every night for the entirety of the voting period.
>
> Thank you for your cooperation in this very important matter to add transparency to the process.

(Exhibit "E")

Although the email was sent directly to Mr. Winn, Defendant Hollins responded to Chairman Vera, stating:

> Alan,

All eSlates and JBCs throughout all of Harris County were secured each night.

There was a 1:1 ratio of eSlates and JBCs at drive-thru voting centers.

All JBCs and MBBs used in this election will be preserved in compliance with Texas law.

All issues regarding stranded votes have been addressed. Of the 1.4 million votes cast, there are roughly twenty votes total that needed to be addressed. This is typical. Mr. Winn has connected directly with Director Ingram on this matter and confirmed that the way in which the stranded votes were recovered was done properly.

I will speak to EVBB today about any further action. I believe the timing of your request should be fine, but will need to confirm.

Thank you,

Chris

(Exhibit "E")

In his response, Defendant Hollins groups the in-person early voting locations with the drive-thru locations when answering Chairman Vera's email. (Exhibit "E") He then identifies the ratio of 1:1 of eSlates and JBCs at drive-thru voting centers. However, he fails to address the problems identified by Chairman Vera related to drive-thru voting:

> "We have knowledge that in Harris County, apparently, the voting booth (eSlate) was not connected back to the JBC after every vote was cast on the eSlate in the drive through locations. Presumably, this activity resulted in not all of the votes being captured on the JBC associated with each eSlate. Please confirm this report."

(Exhibit "E") Specifically, Defendant Hollins fails to specifically answer whether the eSlate not being connected back to the JBC after every vote was cast on the eSlate in drive through locations resulted in not all of the votes being captured on the JBC associated with each eSlate. (Exhibit "E") Defendant Hollins simply brushes off the Republican Chair, stating all the issues of "stranded votes" have been addressed. (Exhibit "E") No explanation is provided. Hollins then claims there were only 20 stranded votes, but the calculation done by Colleen Vera, a member of the Central

14

Count Team, tells a different story. (Exhibit "F") Hollins does not identify how the stranded votes were recovered.

Ms. Collen Vera serves as a member of the Central Count Team. (Exhibit "F") on October 31, 2020, shortly after 8:00 am, the Central Count Team from both parties began receiving the Judge's Booth Centers ("JBC") from early voting. (Exhibit "F") The process began to run normally, they opened the JBC box in front of the Central Count Team, cut the seal to the Mobile Ballot Box ("MBB") compartment, removed the MBB and determined the number of ballots on each MBB. (Exhibit "F") When the first box arrived from a drive-thru voting center, the County Clerk's Director of Elections, Michael Winn, stopped the process. (Exhibit "F") Mr. Winn announced to the Central Count Team that they had detected discrepancies between the number of ballots in the JBC and the number of ballots in the e-slates matched to the JBC for drive-thru locations. (Exhibit "F") It would be impossible for the clerk to appreciate this discrepancy without first opening the JBC. (Exhibit "F") This was not done in the presence of the Central Count Team. (Exhibit "F") Mr. Winn never explained how they determined the discrepancy without first opening the JBC and accessing the MBB. (Exhibit "F") Again, this should have been done in front of the Central Count Team with representatives from each party. (Exhibit "F")

The County Clerk's Director of Elections, Mr. Michael Winn, then handed each member of the Central Count Team a print-out of the ballots from the e-slate for the drive-thru locations. (Exhibit "F") Again, that count was taken without the Central Count Team witnessing the process. (Exhibit "F") To do so, Mr. Winn and his team would have to open each e-slate, unseal the memory card compartment, without the Central Count Team being present. (Exhibit "F") The Texas Election Code requires the Central Count Team to be present when this occurs. (Exhibit

"F") As a member of the Central Count Team, Ms. Vera and her Republican colleague were not present when this occurred. (Exhibit "F")

Ms Vera and the team continued the process for the JBC and e-slates for seven (7) drive-thru locations. (Exhibit "F") They did not see the equipment for two of the drive-thru locations on this first day of central count processing. (Exhibit "F") Ms. Vera compiled the chart found in Exhibit "F" based on 1) e-slate print outs provided by the county clerk on October 31, 2020, 2) voter roster data posted by the county clerk on-line as of October 31, 2020, and 3) the daily record data posted by the county clerk after the polls closed on October 30, 2020. As demonstrated in Exhibit "F", there are significant disparities between the e-slate ballot data from the drive-thru locations and the number of voters reported on the roster and the daily records. (Exhibit "F").

A preliminary injunction is needed in the interim to prevent illegal votes from being cast and tabulated.

### B. Plaintiffs Will Suffer Irreparable Harm Without an Injunction.

The second factor concerns the irreparable harm that a plaintiff would suffer, absent interim relied. *Winter,* 555 U.S. at 20. It is clear that the loss of freedoms under the United States Constitution, Art. I, §4 Cl. 1 and the Equal Protection Clause of the Fourteenth Amendment are either threatened or impaired at the time Plaintiffs seek this relief. The loss of these freedoms for even minimal periods of time, unquestionably constitutes irreparable injury. See *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion of Brennan, J.); *id.* at 374-75 (Stewart, J., concurring in judgment) (an employment termination for political reasons violated First Amendment rights; injunctive relief was properly granted under such circumstances).

### C. The Balance of Equities Supports an Injunction.

The third factor – the balance of equities – tips in favor of Plaintiffs also. Under this factor, the harm to Plaintiffs "should the preliminary injunction not be issued must be weighed against

the harm to others from the granting of the injunction." *United Food & Commercial Workers Union*, 163 F.3d at 363. This balancing of the harm weighs heavily in favor of Plaintiffs. Specifically, to the extent illegal votes are being cast, Plaintiff Wendell Champion who is the Republican nominee for the 18th Congressional District and is on the November 3, 2020 ballot in Harris County, Texas, is harmed in that Defendant is allowing illegal votes to be cast in his election for the United States Congress. Similarly, Plaintiff Sharon Hemphill who is the Republican nominee for the 80th Judicial District Court and is on the November 3, 2020 general election ballot in Harris County, Texas is harmed in that Defendant is allowing illegal votes to be cast in her election for Harris County District Judge. Additionally, with respect to Plaintiff Hotze, every illegal vote cast arguably cancels those like Plaintiff Hotze who cast legal votes. Also, Plaintiff Hon. Steve Toth, a current member of the Texas State Legislature, is harmed in that Defendant Hollins is legislating from the Harris County Clerk's office and implementing a form of voting not found in the Texas Election Code.

The requested preliminary injunction would reduce the harm while not causing any harm to Defendant.

### D. The Public Interest Favors an Injunction.

The last factor – the public interest – also favors Plaintiffs, because it is always in the public interest to prevent the violation of a party's constitutional rights. *Gannett Co., Inc. v. DePasquale,* 443 U.S. 368, 383 (1979). *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). Additionally, it is in the public interest to stop illegal votes from being cast and to maintain the integrity of the ballot box. Moreover, it is in the public interest to maintain consistency in the manner of voting throughout Texas' 254 counties and to guarantee that a County Clerk does not unilaterally create a form of voting not recognized by the Texas Election Code.

## **CONCLUSION**

For the foregoing reasons, this Court should enter the preliminary injunction against Defendant as requested by Plaintiffs.

Dated: November 1, 2020

Respectfully submitted,

  */s/ Jared R. Woodfill*
JARED R. WOODFILL
State Bar No. 00788715
Woodfill Law Firm, P.C.
3 Riverway, Suite 750
Houston, Texas 77056
P:(713) 751-3080
Fax: (713) 751-3058
woodfillservice@gmail.com
*Counsel for Plaintiffs*