United States Courts
Southern District of Texas
FILED

*November 2, 2020*

David J. Bradley, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

STEVEN HOTZE, M.D., *et al.*,

        Plaintiffs,

v.

CHRIS HOLLINS, in his official capacity as Harris County Clerk,

        Defendant.

Civil Action No. 4:20-cv-03709

**BRIEF BY *AMICI CURIAE* BENJAMIN L. GINSBERG AND JOSEPH R. STRAUS III
IN OPPOSITION TO PLAINTIFFS' MOTION
<u>FOR EMERGENCY INJUNCTIVE RELIEF</u>**

HAYNES AND BOONE, LLP

Mark Trachtenberg
S.D. Tex. No. 24584
Texas Bar No. 24008169
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
<u>mark.trachtenberg@haynesboone.com</u>

ATTORNEY FOR AMICI BENJAMIN L. GINSBERG
AND JOSEPH R. STRAUS III

**INTEREST OF AMICI**

*Amici*, Benjamin L. Ginsberg and Joseph R. Straus III, have spent their professional lives in Republican politics and public service and, as such, are strong believers in the importance of both free and fair elections and respect for states' roles administering state laws free from unwarranted federal interference. They therefore have a strong interest in ensuring that the ongoing federal election is conducted in a manner consistent with these principles. Because Plaintiffs' motion threatens to undermine both of these core commitments, amici submit this brief in opposition to their motion on the merits.

Mr. Ginsberg is an expert in election law who has spent his career working in the trenches of Republican politics. Mr. Ginsberg practiced law for 38 years before recently retiring. During that time, he represented numerous political parties, political campaigns, candidates, members of Congress and state legislatures, governors, and others in matters including federal and state campaign finance laws, ethics and gifts rules, pay-to-play laws, election administration, government investigations, redistricting, communications law, and election recounts and contests. He served as counsel to all three Republican national party committees and represented four of the past six Republican presidential nominees (including, through his former law firm, President Trump's 2020 Campaign). He also served as counsel to the Republican Governors Association. Mr. Ginsberg has extensive experience on the state legislative level, including leading Republican redistricting efforts nationwide for many years. He played a central role in the 2000 Florida recount (during which he fought Democrats' efforts to throw out thousands of ballots), as well as several dozen Senate, House, and state election contests. Mr. Ginsberg also co-chaired the bipartisan 2013 Presidential Commission on Election Administration.

Mr. Straus is a native of San Antonio, a fifth-generation Texan, and a Republican. He served as Speaker of the Texas House of Representatives from 2009 until 2019, making him the

1

longest-serving Republican Speaker in Texas history. While in the Texas State House, Mr. Straus represented District 121 in the Texas State legislature from 2005 until his retirement. Before serving in the Texas State House, Mr. Straus served in the administrations of President George H. W. Bush and President Ronald Reagan. Before that, he served as former Congressman Lamar Smith's campaign manager in his first race for Congress. Mr. Straus has also served on the Management Committee of the Bexar County Republican Party, as a precinct chairman, and on numerous campaign committees for federal, state, and local candidates, including as a past Chairman of the Republican Legislative Campaign Committee. He continues to engage with the State Legislative Leaders Foundation and, among other things, serves as a member of the Honorary Board of Directors at the SMU John Goodwin Tower Center for Political Studies. Mr. Straus also continues to provide leadership with the national Republican Party by serving on the Board of Directors of the Republican State Leadership Committee. Over his long career as a candidate, campaign manager, and legislator, Mr. Straus has been both the drafter and the subject of the state's election laws.

## INTRODUCTION

Plaintiffs ask this Court to ignore the plain text of the Texas Election Code, to impose an atextual construction of a state statute when the Texas Supreme Court has declined to do so, and to throw out more than 100,000 votes cast by retroactively declaring those voters' chosen method of voting illegal. The Harris County drive-thru voting program was announced months ago, yet Plaintiffs waited to bring suit until just six days before the election, after tens of thousands of Harris County residents relied on the instructions of their local election officials and had already cast their votes under the program. That Plaintiffs cloak their eleventh-hour effort in principles of federalism and deference to the Texas Legislature is puzzling, not persuasive. Plaintiffs' motion rests on the remarkable contention that the Elections Clause's assignment of election

2

administration authority to *states*, in fact, gives *federal* courts free reign to rewrite state election law for themselves where state officials have implemented the state election code in a manner that is consistent with its text. Because neither the Texas Election Code nor the Elections Clause is susceptible to the interpretation Plaintiffs advance, this Court should deny Plaintiffs' emergency motion for injunctive relief.

## ARGUMENT

*Amici* take no position on the threshold issues, including whether Plaintiffs have standing or whether this Court should refrain from acting pursuant to traditional abstention doctrines. Rather, *amici* contend only that drive-thru voting is consistent with the text of the Texas Election Code and that, even under an expansive reading of the Elections Clause, a federal court should refrain from throwing out votes cast under a reasonable interpretation of a state statute, especially when there is no allegation that voter error is involved. The Court therefore need only consider the arguments raised in this brief if it gets past the threshold issues raised by the parties and proposed intervenors.

**I.  Harris County's drive-thru voting is permitted by the statutory scheme established by the Texas Legislature under Article I of the U.S. Constitution.**

This Court should reject Plaintiffs' requested relief—as the Texas Supreme Court has already done twice—because the Texas Legislature has plainly provided the Harris County clerk with the authority to establish drive-thru voting locations under the Texas Election Code. *See In re Hotze*, No. 20-0863 (Tex. Nov. 1, 2020) (denying a petition for writ of mandamus brought by Plaintiffs raising the same arguments they press here); *In re Hotze*, No. 20-0819 (Tex. Oct. 22, 2020) (same).

Defendants and Intervenors have persuasively argued that these drive-thru voting locations are *not* "curbside voting." Yet even if the Court were to consider applying Texas Election Code

3

provision governing curbside voting, *see* TEX. ELEC. CODE § 64.009(a), the drive-thru voting program is consistent with these provisions. In enacting Section 64.009(a), the Texas Legislature provided that "[i]f a voter is physically unable to enter the polling place without . . . likelihood of injuring the voter's health, on the voter's request, an election officer shall deliver a ballot to the voter at the polling place entrance or curb." *Id*. The Legislature further provided that "[t]he regular voting procedures may be modified by the election officer to the extent necessary to conduct voting under this section." *Id.* § 64.009(b). The Legislature assigned the Defendant, as the county clerk, the responsibility of "conduct[ing]" early voting in Harris County. TEX. ELEC. CODE §§ 83.001(a), 83.002. Defendant's establishment of drive-thru voting centers is consistent with the plain text of the Legislature's chosen voting procedures and his obligation to "conduct" elections in accord with those procedures.

In implementing the statutory scheme for elections established by the Legislature, Defendant could reasonably have interpreted this provision to permit curbside voting for those concerned that entering an indoor polling place would expose them to COVID-19. As Governor Abbott's own statewide mask mandate acknowledges, entering indoor locations, especially where many other individuals are or recently have been, poses a greater threat of COVID-19 exposure than remaining outdoors. *See* Tex. Exec. Order No. GA 29, at 2 (imposing a stricter mask-mandate for indoor locations than outdoor locations).[1] The risk of COVID-19 exposure is even higher where, as is currently the case in Texas, masks are not required for either election officials or voters.[2] *Id.* (wearing a face covering is not required for "any person who is voting, assisting a

---

[1] Available at https://gov.texas.gov/uploads/files/press/EO-GA-29-use-of-face-coverings-during-COVID-19-IMAGE-07-02-2020.pdf.

[2] The Fifth Circuit has stayed a district court decision holding that this exemption from the mask mandate for voting locations violates Section 2 of the Voting Rights Act of 1965. *See Mi Familia Vota v. Abbott*,

4

voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged"). It is therefore consistent with the text of § 65.009(a) for Defendant to determine that entering a polling location creates a "likelihood of injuring the voter's health," thus entitling voters to curbside voting upon "request." By electing to vote at a drive-thru location, rather than an indoor polling place, a voter can be considered to have "request[ed]" that an "election officer . . . deliver a ballot to the voter at the . . . curb."[3] TEX. ELEC. CODE § 64.009(a). The Texas Election Code therefore explicitly contemplates that voters can vote from their cars when entering a polling place poses a health hazard.[4] That, alone, is sufficient to doom Plaintiffs' efforts to throw out more than 100,000 votes cast pursuant to this statute.

The Texas Supreme Court's rejection of COVID-fear-based absentee voting during the COVID-19 pandemic is not to the contrary. In *In re State*, 602 S.W.3d 549 (Tex. 2020), that court considered whether the Texas statute permitting individuals to vote by mail "if the voter has a sickness or physical condition that prevents the voter from appearing at the polling place on election day without a likelihood . . . of injuring the voter's health" could be extended to apply to every Texan without COVID-19 immunity who feared exposure to COVID-19 at their polling place. *Id.* at 550 (quoting TEX. ELEC. CODE § 82.002(a)). The court declined to apply the provision so broadly, reasoning that giving the term "physical condition" such a broad meaning would render the other mail-in-voting categories surplusage. The court also noted that the term "condition"

---

No. 20-50907 (5th Cir. Oct. 30, 2020) (Document No. 00515621384), *staying* No. SA-20-CV-00830-JKP, 2020 WL 6304991 (W.D. Tex. Oct. 27, 2020).

[3] Even if Plaintiffs find unusual this means of providing the accommodation, they must still contend with the authority that the Legislature expressly conferred upon the "election officer" to "modif[y]" "[t]he regular voting procedures . . . to the extent necessary" to comply with section 64.009(a). *Id.* § 64.009(b).

[4] Plaintiffs incorrectly contend that a sufficient affidavit demonstrating likelihood of injury is necessary to vote in this fashion, citing the requirements for early voting *by mail*. *See* Dkt. 1 at 5-6 (citing TEX. ELEC. CODE §§ 104.001, 104.002, which apply to applications to vote by mail). Where a voter wishes to vote early *in person*, no such requirement applies. *See* TEX. ELEC. CODE § 85.034.

5

might only mean those physical conditions that indicate some "abnormality," which would exclude a lack of immunity to COVID-19, which "is not an abnormal or distinguishing condition." *Id*. at 559-60.

The Texas Supreme Court's decision thus hinged on the fact that the absentee ballot statute's accommodation for health concerns applies based on a showing that an individual has a particular "physical condition" or "disability" that is unique or somehow specific to the voter. *Id.* (construing TEX. ELEC. CODE § 82.002(a)). The curbside voting accommodation, by contrast, does not depend on the existence of any characteristic specific to the voter and instead focuses only on whether the "enter[ing] the polling place" creates a "likelihood of injuring the voter's health." TEX. ELEC. CODE § 64.009(a). Where a polling place itself is or might reasonably be understood to be a health hazard, no individualized showing is necessary. *See id.*

**II.     The Court must decline to throw out votes cast based on a retroactive rewriting of state rules governing the administration of the election.**

Invoking the Elections Clause of Article I of the Constitution, Plaintiffs ask this Court to step in and adopt a strained reading of state law to disqualify the ballots of more than 100,000 voters despite the fact that the interpretation that plaintiffs urge relies on a strained reading of state statutes and has been rejected by the Texas Supreme Court. Plaintiffs' argument is based on a novel legal theory—sometimes referred to as the "independent state legislature doctrine"—that has never been adopted by the Supreme Court and is in significant tension with existing precedent. *See, e.g.*, *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787 (2015). In any event, Plaintiffs fundamentally misunderstand the theory.

In short, proponents of the independent state legislature theory contend that because the Constitution delegates authority to state legislatures to determine the "Times, Places and Manner of holding Elections for Senators and Representatives," U.S. Const. art. I, § 4, cl. 1, and the

6

"Manner" of appointing presidential electors, U.S. Const. art. II, § 1, cl. 2, federal courts have a role in protecting this state legislative authority by, for example, ensuring that state courts do not ignore the plain meaning of state law. But even if this legal theory is correct and applicable— which *amici* doubt—it does not extend nearly as far as Plaintiffs contend. Even under the most expansive understanding of the theory, it does not provide a federal court carte blanche to substitute its own interpretation of state law. Rather, only where a state official's interpretation has "significantly depart[ed]" from the text of the state statute would a federal court have a role in determining whether the interpretation has strayed too far. *See, e.g.*, *Democratic Nat'l Comm. v. Wisc. State Leg.*, No. 20A66, 2020 WL 6275871, at \*6 n.1 (U.S. Oct. 26, 2020) (Kavanaugh, J., concurring) (mem.) ("In a Presidential election . . . a state court's '*significant departure* from the legislative scheme for appointing Presidential electors presents a federal constitutional question.'" (quoting *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C. J., concurring)) (emphasis added)). As discussed above, Defendant's interpretation of state law—both that the drive-thru voting program is *not* a form of curbside voting, and that, even if it were, it is consistent with the curbside voting rules—is *at least* plausible, and thus this is not a case that calls for a federal court "to ensure that state courts do not rewrite state election law." *Id.* To the contrary, Harris County's actions are perfectly consistent with the will of the Texas Legislature.

The Court should be especially reluctant to step in here because the Supreme Court "has repeatedly emphasized that federal courts ordinarily should not alter state election laws in the period close to an election." *Id.* at \*3 (Kavanaugh, J., concurring) (citing *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam)) (collecting cases). In one recent case, a majority of the Justices suggested that a district court order that was issued more than six weeks *before* the start of early voting was too "late-breaking." *See id.*; *id.* at \*1 (Roberts, CJ, concurring in the denial of

7

application to vacate stay) ("In this case, as in several this Court has recently addressed, a District Court intervened in the thick of election season to enjoin enforcement of a State's laws" and that district court decision must be stayed); *id.* at *1-2 (Gorsuch, J., concurring in the denial of application to vacate stay) (district court acted improperly in changing rules "[w]eeks before a national election"). Changing "the rules of the road" at the last minute is likely to confuse voters and elections officials and undermine the states' interest "in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election." *See id.* at *3 (Kavanaugh, J., concurring).

No matter exactly how late is too late under this principle, an emergency challenge to a months-old policy brought on the last day of early voting is certainly too late, as more than 100,000 voters are not merely likely to be confused, but will be disenfranchised through no fault of their own because they *have already relied* on the challenged rule. *Id.* (explaining that the principle "discourages last-minute litigation and instead encourages litigants to bring any substantial challenges to election rules ahead of time, in the ordinary litigation process"); *see also In re Pichardo*, No. 14-20-00697-CV, 2020 WL 6051700, at *3 (Tex. App.—Houston [14th Dist.] Oct. 14, 2020, orig. proceeding) (denying petition for writ of mandamus limiting curbside voting in part because "the election is currently in progress and the relators delayed filing this mandamus until over a month after learning of the actions of the Harris County Clerk's Office"). It is hard to imagine a scenario more damaging to the public's confidence in a fair election than a last-minute order from a federal judge throwing out the votes of over 100,000 voters for no reason other than that those voters relied on a state election official's reasonable interpretation of a state election statute. *Cf. Andino v. Middleton*, No. 20A55, 2020 WL 5887393, at *1 (U.S. Oct. 5, 2020) (staying

a lower court order dispensing of a witness requirement for absentee ballots, but permitting ballots cast while that order was in effect to be counted without complying with that requirement).

Moreover, the Court should be especially wary of intervening here because the Texas Legislature, charged with protecting the health and welfare of Texans, expressly created a statutory mechanism to address health concerns connected with in-person voting, which has been implemented by local elected officials in a manner consistent with its text. TEX. ELEC. CODE § 64.009(a). *Cf. Democratic Nat'l Comm.*, 2020 WL 6275871, at *5 (Kavanaugh, J., concurring) (observing that "federal judges do not possess special expertise or competence about how best to balance the costs and benefits of potential policy responses to the pandemic, including with respect to elections").

Finally, even if the Court somehow concludes that the votes cast here were cast in violation of Texas state law, it cannot prevent these votes from being counted. Throwing out these 100,000 votes based on the fact that they were cast via drive-thru voting violates federal law, which provides,

> No person acting under color of law shall . . . deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election.

52 U.S.C. § 10101. Invalidating votes cast via drive-thru voting because voters failed to enter polling places, as Plaintiffs' contend is required, would undoubtedly deny tens of thousands of people the right to vote in the 2020 congressional election due to an "error or omission" in an "act requisite to voting." Whether a voter walks indoors to vote or performs all of the same steps from the safety of her vehicle cannot, by the plain text of the statute, be "material in determining whether such individual is qualified under State law to vote in [the] election." *Id.* Indeed, the fact that the Texas Legislature has provided no formal application or approval process for curbside voting, *see*

9

TEX. ELEC. CODE § 64.009, further underscores that voting from one's car rather than indoors has no bearing even on *enforcing* or monitoring voter qualifications. Thus, even if the Court concludes that these votes were cast pursuant to improper procedures, it may not throw them out.

## CONCLUSION

*Amici* are particularly sensitive to the irony that Republicans are now seeking to throw out votes cast by eligible voters because of what would amount to a technical error by elections officials. During the 2000 presidential election recount, it was Democrats who sought unsuccessfully to exclude 25,000 absentee ballots in the predominantly Republican counties of Martin and Seminole. During that election, *amicus* Mr. Ginsberg, alongside co-counsel that included now-Justice Amy Coney Barrett, argued that this same provision of federal law, then codified at 42 U.S.C. § 1971(a)(2)(B), prohibited that effort to disenfranchise eligible voters based solely on an administrative error by elections officials. Not so long ago, it was a core tenet of the Republican Party that the vote of every qualified voter should be counted, even if, at times, it did not work in the Party's favor. While the Republican plaintiffs might seek to disavow that principle by bringing this action, *amici* respectfully ask this Court to reaffirm it.

Respectfully submitted,

HAYNES AND BOONE, LLP

*/s/ Mark Trachtenberg*
Mark Trachtenberg
S.D. Tex. No. 24584
Texas Bar No. 24008169
1221 McKinney Street, Suite 4000
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
mark.trachtenberg@haynesboone.com

ATTORNEY FOR AMICI BENJAMIN L. GINSBERG
AND JOSEPH R. STRAUS III